No. 25-1470

# In the United States Court of Appeals for the Tenth Circuit

---

MATTHIAS O'MEARA AND CHOICE ADVISORS, LLC,

*Plaintiffs-Appellants*,

v.

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

*Defendant-Appellee.*

---

*On Appeal from the U.S. District Court for the District of Colorado*
*No. 25-cv-00878-GPG-TPO*
*Honorable Gordon P. Gallagher, District Judge*

---

## APPELLANTS' REPLY BRIEF

---

JOSHUA M. ROBBINS
CHARLES M. BRANDT
Pacific Legal Foundation
3100 Clarendon Blvd.,
  Suite 1000
Arlington, VA 22201
(901) 590-6372
JRobbins@pacificlegal.org
CBrandt@pacificlegal.org

OLIVER J. DUNFORD
Pacific Legal Foundation
4440 PGA Blvd., Suite 307
Palm Beach Gardens, FL 33410
(916) 503-9060
ODunford@pacificlegal.org

PAUL L. VORNDRAN
Jones & Keller, P.C.
1675 Broadway, 26th Floor
Denver, CO 80202
(303) 573-1600
pvorndran@joneskeller.com

*Counsel for Appellants*

# TABLE OF CONTENTS

**Page**

Table of Authorities.................................................................................iii

Argument.................................................................................................. 1

    I.   O'Meara Is Entitled to an Article III Tribunal ........................... 2

        A. The Narrow Public-Rights Exception Does Not Apply .......... 3

        B. Whether Equitable or Legal, the Follow-On Claims
           Implicate Core Private Rights ............................................ 12

        C. SEC Associational or Industry Bars Result in
           Immediate Deprivations of Liberty and Property............... 15

           1. Effect of SEC Bar ........................................................... 15

           2. Limited Judicial Review ................................................. 16

    II.  The District Court Had Subject Matter Jurisdiction
       Over O'Meara's Seventh Amendment Claim ........................... 17

        A. The Court Had Jurisdiction Over Both the Article III
           and the Seventh Amendment Claims.................................. 17

        B. The *Thunder Basin* Factors Confirm Jurisdiction............... 18

           1. Meaningful Judicial Review .......................................... 18

           2. Collaterality.................................................................... 19

           3. Agency Expertise............................................................ 21

    III. O'Meara's Due Process Claim Is Not Foreclosed
       by Precedent............................................................................ 22

           1. Fragmentation of Claims............................................... 22

           2. Incentives for Bias......................................................... 24

    IV.  The District Court Had Subject Matter Jurisdiction Over
       O'Meara's *Res Judicata* Claim ............................................. 28

           1. Meaningful Judicial Review........................................... 28

           2. Collaterality.................................................................... 29

           3. Agency Expertise............................................................ 30

Conclusion ............................................................................................. 31

- ii -

Certificate of Compliance ................................................................. 32

Certificate of Digital Submission ...................................................... 33

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Astoria Fed. Sav. & Loan Ass'n v. Solimino,*
  501 U.S. 104 (1991) ............................................................................. 28

*AT&T, Inc. v. FCC,*
  135 F.4th 230 (5th Cir. 2025)
  *cert. granted*, No. 25-567 (U.S. Jan. 9, 2026) ......................................... 9

*Axon Enter., Inc. v. FTC,*
  598 U.S. 175 (2023) ........................................ 1, 17–21, 28–30

*Bd. of Regents of State Colls. v. Roth,*
  408 U.S. 564 (1972) ............................................................................. 13

*Blakely v. Washington,*
  542 U.S. 296 (2004) ........................................................................ 18, 20

*Blinder, Robinson & Co. v. SEC,*
  837 F.2d 1099 (D.C. Cir. 1988) ........................................................... 24

*Cap. Traction Co. v. Hof,*
  174 U.S. 1 (1899) ................................................................................. 20

*Carr v. Saul,*
  593 U.S. 83 (2021) ............................................................................... 27

*Case of the Tailors of Ipswich*
  (1615) 77 Eng. Rep. 1218 (KB) ........................................................... 10

*Coll. of Physicians v. Rose*
  (1703) 87 Eng. Rep. 806 (QB) ............................................................. 10

*Crowell v. Benson,*
  285 U.S. 22 (1932) ............................................................................ 7, 14

*Ex Parte Bakelite Corp.,*
  279 U.S. 438 (1929) ............................................................................... 8

*Federated Dep't Stores, Inc. v. Moitie,*
  452 U.S. 394 (1981) ............................................................................. 29

*Granfinanciera, S.A. v. Nordberg,*
  492 U.S. 33 (1989) ............................................................................... 17

*Haaland v. Brackeen,*
   599 U.S. 255 (2023) .................................................................................. 6

*Lumley v. Wagner,*
   (1852) 42 Eng. Rep. 687 (Ch) .............................................................. 10

*MACTEC, Inc. v. Gorelick,*
   427 F.3d 821 (10th Cir. 2005) ............................................................ 30

*Markham v. Jaudon,*
   41 N.Y. 235 (1869) .................................................................................. 8

*Morris v. Coleman,*
   (1812) 34 Eng. Rep. 382 (Ch) .............................................................. 10

*Murray's Lessee v. Hoboken Land & Improvement Co.,*
   59 U.S. 272 (1856) ....................................................................... 6, 8, 13

*New Hampshire v. Maine,*
   532 U.S. 742 (2001) .............................................................................. 28

*Norris v. Staps,*
   (1616) 80 Eng. Rep. 357 (KB) ............................................................ 10

*Oil States Energy Servs. v. Greene's Energy Grp.,*
   584 U.S. 325 (2018) ............................................................................... 7

*Plaut v. Spendthrift Farm,*
   514 U.S. 211 (1995) .............................................................................. 29

*Riggins v. Goodman,*
   572 F.3d 1101 (10th Cir. 2009) .................................................... 23, 27

*S. Pac. R. Co. v. United States,*
   168 U.S. 1 (1897) ............................................................................ 29, 31

*Saad v. SEC,*
   873 F.3d 297 (D.C. Cir. 2017) ............................................................ 14

*SEC v. Abarbanel,*
   No. 21-cv-5429 (AS),
   2025 WL 1903792 (S.D.N.Y. July 10, 2025) ..................................... 23

*SEC v. Choice Advisors, LLC,*
   No. 21-cv-1669-JO-MSB,
   2024 WL 4469095 (S.D. Cal. Oct. 7, 2024) ................................. 25–26

*SEC v. Gupta,*
  No. 11-cv-7566(JSR),
  2013 WL 3784138 (S.D.N.Y. July 17, 2013) ........................................23

*SEC v. Jarkesy,*
  603 U.S. 109 (2024) ...................................... 1–7,  10–14, 21

*Semtek Int'l Inc. v. Lockheed Martin Corp.,*
  531 U.S. 497 (2001) ..........................................................30

*Staton v. Mayes,*
  552 F.2d 908 (10th Cir. 1977) ..........................................27

*Steadman v. SEC,*
  603 F.2d 1126 (5th Cir. 1979) ..........................................19

*Stern v. Marshall,*
  564 U.S. 462 (2011) ...................................................... 7, 9, 17

*Sun Valley Orchards, LLC v. U.S. Dep't of Lab.,*
  148 F.4th 121 (3d Cir. 2025)
  *cert. granted,* No. 25-966 (U.S. Apr. 27, 2026) ....................................14

*Taylor v. Sturgell,*
  553 U.S. 880 (2008) ..........................................................30

*Thomas v. Union Carbide Agric. Prods. Co.,*
  473 U.S. 568 (1985) ........................................................... 7

*Thunder Basin Coal Co. v. Reich,*
  510 U.S. 200 (1994) ............................................... 18, 21, 28

*Tull v. United States,*
  481 U.S. 412 (1987) ............................................... 11, 13

*Williams v. Pennsylvania,*
  579 U.S. 1 (2016) ..........................................................24

*Withrow v. Larkin,*
  421 U.S. 35 (1975) ..........................................................22–23

*Zen Magnets, LLC v. CPSC,*
  968 F.3d 1156 (10th Cir. 2020) ................................................23, 27

## United States Constitution

U.S. Const. art. III, § 1 ..........................................................16

U.S. Const. art. III, § 2 ................................................................2

U.S. Const. art. III, § 2, cl. 2 .....................................................17

## Statutes

15 U.S.C. § 78b ............................................................................7

15 U.S.C. § 78o-4(a)(2)(B)..........................................................13

15 U.S.C. § 78o-4(c)(4) ...............................................................16

15 U.S.C. § 78o-4(c)(5) ...............................................................16

15 U.S.C. § 78u(d)(5) ..................................................................23

15 U.S.C. § 78y(a)(4) .............................................................16, 23

15 U.S.C. § 78y(c) .......................................................................16

28 U.S.C. § 1331 .........................................................................18

## Other

1 Story, Joseph, *Commentaries on Equity Jurisprudence
  as Administered in England and America*
  (4th ed. 1846) ....................................................................10–11

17 C.F.R. § 240.15Bc4-1 .............................................................16

Fed. R. Civ. P. 8(c)(1).................................................................29

Fed. R. Civ. P. 38(a)...................................................................19

Fed. R. Civ. P. 56(a)...................................................................19

*In re Choice Advisors LLC*,
  Div. of Enf't's Mot. for Summ. Disposition,
  Admin. Proc. File No. 3-22250 (S.E.C. Jan. 17, 2025),
  https://tinyurl.com/2266p7vw ..............................................26

*In re Stewart,*
  Exchange Act Release No. 99613, Investment Advisors
  Act Release No. 6563 (S.E.C. Feb. 27, 2024)
  https://tinyurl.com/4akdxnmx ..............................................26

Neibart, Elias & Meilaender, Jonathan, *Non-Article III Adjudication
  after Jarkesy: The Absolute Adjunct Model*,
  34 Geo. Mason L. Rev. (forthcoming 2027) ..............................8

Velikonja, Urska, *Reporting Agency Performance:*
   *Behind the SEC's Enforcement Statistics,*
   101 Cornell L. Rev. 901 (2016) ........................................................ 26

Whitehouse, Sheldon, *Restoring the Civil Jury's*
   *Role in the Structure of Our Government,*
   55 Wm. & Mary L. Rev. 1241 (2014) ............................................... 20

## ARGUMENT

Having obtained a judgment against O'Meara and Choice Advisors in federal district court—which (1) found liability under the Securities Exchange Act of 1934 and (2) imposed monetary penalties and injunctive relief—the Securities and Exchange Commission now seeks in its home court additional sanctions, including a "career death penalty" against O'Meara, for the same conduct.

The SEC can't dispute that it could have sought these additional sanctions in court—it has done precisely that in other cases—or that the district court's permanent injunction, based on violations of the Exchange Act, is a necessary predicate to the SEC's follow-on proceeding. But the SEC maintains nonetheless that its proceeding is "distinct" from the district court case and that, in any event, the in-house proceeding implicates only public rights. In support, the SEC repeats the incantation "public interest" and rehashes arguments rejected by the Supreme Court in *SEC v. Jarkesy*, 603 U.S. 109 (2024), and *Axon Enter., Inc. v. FTC*, 598 U.S. 175 (2023).

The SEC's arguments also turn settled legal principles on their head. The SEC claims (SEC Br. 11, 14) that private-rights actions are

merely "generally" reserved to Article III courts and (*id.* 22) that O'Meara must show that the narrow public-rights *exception* to Article III jurisdiction does *not* apply. The SEC then ignores Supreme Court precedent and demands a precise common-law analog for the follow-on action. *But see Jarkesy*, 603 U.S. at 125 (noting Congress's "decision to *draw upon* common law fraud") (emphasis added).

With business-destroying sanctions on the line, O'Meara has the right to an Article III judicial tribunal in the first instance; and if the claims are legal—as O'Meara alleges—he is also entitled to a jury trial under the Seventh Amendment. Article III and the Seventh Amendment impose structural impediments to the SEC's adjudication; and, given the SEC's attempt to press its claims in separate forums, so do principles of due process and *res judicata*. As a matter of constitutional structure, the SEC lacks authority to bring its follow-on claims *at all*.

## I. O'MEARA IS ENTITLED TO AN ARTICLE III TRIBUNAL

The SEC does not dispute that the judicial power of the United States extends "to all cases, in Law and Equity," arising under federal law, U.S. CONST. art. III, § 2; or that its follow-on proceeding arises under federal law. And, as the SEC argued below, its "follow-on administrative

proceeding seek[s] equitable remedies," App. 78, namely, orders prohibiting Mr. O'Meara from participating in the municipal-securities industry and a censure of his firm Choice Advisors. That should be the end of the dispute, since "matters concerning private rights may not be removed from Article III courts." *Jarkesy*, 603 U.S. at 127 (citations omitted).

The SEC claims, however, that the follow-on proceeding involves only public rights—even though, as just noted, the SEC seeks to restrict Mr. O'Meara's private rights to make a living and use his property. The SEC's argument fails. The public-rights doctrine creates a narrow exception to Article III jurisdiction and, therefore, "even with respect to matters that arguably fall within the scope of the public rights doctrine, the presumption is in favor of Article III courts." *Id.* at 132 (citation modified). The SEC cannot come close to overcoming that presumption.

### A. The Narrow Public-Rights Exception Does Not Apply

**1.** The public-rights exception is narrow. "It has no textual basis in the Constitution," and must therefore "derive ... from background legal principles" and long-established historical practice. *Jarkesy*, 603 U.S. at 131. Based on those principles and practice, *Jarkesy* recognized discrete categories of public rights: internal revenue collection, tariffs,

immigration, public lands, public benefits, and Indian affairs. Each of these categories corresponds to a specific grant of power in Article I, and administrative adjudication thereof "bear[s] the sanction of history." *Id.* at 159 (Gorsuch, J., concurring). That is, each possesses a long historical pedigree of adjudication in non-Article III tribunals. In contrast, as *Jarkesy* recently confirmed, securities claims are private-rights claims with even longer historical pedigrees of adjudication in common-law and chancery courts. *Id.* at 129 n.1 (majority opinion). And the sought-after sanctions—equitable orders—are themselves long-standing *judicial* powers. *See* Opening Brief (Op. Br.) 17. The follow-on proceeding, therefore, is a matter of private rights for which an Article III forum is required.

**2.** The SEC offers no sound reason to expand the public-rights exception, particularly given the Supreme Court's admonition to examine its application "with care." *Jarkesy*, 603 U.S. at 131. Indeed, the SEC's unbounded conception of public rights runs headlong into *Jarkesy*'s observation that the exception extends only to matters that "historically could have been determined *exclusively* by [the executive and legislative] branches." *Id.* at 128 (citation modified). The SEC cannot establish that

- 4 -

disciplining securities professionals was *ever* a matter exclusively reserved to Congress or the Executive Branch.

**a.** Instead, the SEC faults *O'Meara* for failing to "identify" a "tradition" of "common law courts around the founding adjudicating claims regarding registration within a regulated field." SEC Br. 22. That assertion is not only incorrect (as discussed below), but it turns the analysis on its head. The onus is not on O'Meara to prove "the presumption ... in favor of Article III." *Jarkesy*, 603 U.S. at 132 (citation omitted). Rather, it is *the government* which must establish that the narrow public-rights *exception* trumps the Article III presumption. And the government fails.

**b.** The SEC doesn't even suggest that the follow-on proceeding or securities claims fall within the six categories of public-rights matters identified by *Jarkesy*; it responds that the public-rights exception is not confined to these categories. SEC Br. 22–23. But it fails to grapple with the common attributes of these six categories, namely: a specific grant of power in Article I long understood to permit adjudication exclusively in the political branches.

Thus, the Supreme Court "took pains to justify the application of the [public-rights] exception" to non-judicial resolution of internal-rev-

- 5 -

enue claims "by explaining that it flowed from centuries-old rules concerning revenue collection by a sovereign." *Jarkesy*, 603 U.S. at 131 (citing *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 281–85 (1856)). The immigration exception stems from Congress's plenary power over immigration and naturalization. *Id.* at 129. The exception for tariffs recognizes that "the political branches ha[ve] traditionally held exclusive power over th[e] field," *id.* at 130, while the exception for tribal claims is a function of Congress's authority over Indian affairs and the unique "trust relationship" that springs from that power. *Haaland v. Brackeen*, 599 U.S. 255, 274 (2023) (citation modified). Lastly, public lands and benefits are legislative acts of grace that concern property belonging to the government. *Jarkesy*, 603 U.S. at 130.

**c.** The SEC must thus show that the application of the public-rights exception should be extended to securities claims. But "[w]ithout … close attention to the basis *for each asserted application* of the doctrine, the exception would swallow the rule." *Jarkesy*, 603 U.S. at 131 (emphasis added) (footnote omitted). And the SEC fails to establish a justifiable basis to expand the doctrine and apply it in the context of securities regulation.

The closest the SEC comes is based on the Interstate Commerce Clause, which authorizes the SEC to regulate the securities industry. 15 U.S.C. § 78b. Yet the Supreme Court has never held that this clause serves as grounds to invoke the public-rights doctrine. The SEC cites *Crowell v. Benson*, 285 U.S. 22 (1932), to argue otherwise. SEC Br. 23. But if *Crowell* supported that proposition, *Jarkesy* would have turned out differently. 603 U.S. at 129 n.1 (rejecting contention that "the public rights exception applies to cases concerning the securities market or interstate commerce more broadly"). *Crowell* itself turned on (1) the admiralty nature of the claim, *see Jarkesy*, 603 U.S. at 156 (Gorsuch, J., concurring); and (2) the agency's service as a "true" judicial adjunct. *Stern v. Marshall*, 564 U.S. 462, 489 n.6 (2011). The commerce clause had nothing to do with *Crowell*'s holding, and *Crowell* fails to support the SEC's argument here.

**d.** Virtually every other case cited by the SEC involved privileges created by the government—matters unknown to law or equity. *See, e.g.*, *Oil States Energy Servs. v. Greene's Energy Grp.*, 584 U.S. 325, 335 (2018) (patents); *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 584–85 (1985) (congressional data-sharing compensation scheme that created

new rights, unrecognized by state common law); *see also* SEC Br. 14 (discussing patents and "military pensions"); *id.* at 23–24 (revenue collection) (citing *Murray's Lessee* and *Ex Parte Bakelite Corp.*, 279 U.S. 438 (1929)).

And unlike the privileges at issue in *Oil States* or *Thomas*, the rights at issue here predate the Exchange Act: The right to make a living in a lawful profession and the right to one's property are ancient. *See* Op. Br. 22–23. The right to act as an agent or broker in the buying and selling of securities was firmly established at common law, governed by traditional principles of "agency" and the "law of pledge." *Markham v. Jaudon*, 41 N.Y. 235, 240–42 (1869). Congress didn't create these rights under the Exchange Act; it included them. And because Congress did not wield the "greater power" of creating the rights it seeks to strip, it does not possess the "lesser power" of removing their adjudication from Article III. Elias Neibart & Jonathan Meilaender, *Non-Article III Adjudication after* Jarkesy*: The Absolute Adjunct Model*, 34 Geo. Mason L. Rev. (forthcoming 2027) (manuscript at 24–25 & n.185).[1]

Even comprehensive regulation cannot transmogrify the buying and selling of securities—antecedent common-law rights predating the

---

[1] https://papers.ssrn.com/sol3/papers.cfm?abstract_id=6625201

Exchange Act—into public franchises, to be enjoyed only at the Congress's sufferance. Otherwise, the government could expand the scope of the public-rights exception through comprehensive federal regulation of areas traditionally reserved to the states, and the courts "would be transformed from the guardian[s] of individual liberty" into artifacts of "mere wishful thinking." *Stern*, 564 U.S. at 495.

**e.** Unable to justify the expansion of the narrow public-rights exception, the SEC is left to declare, ad nauseam, that securities transactions are affected with a public interest and that Congress's licensure scheme advances that interest. SEC Br. 17–18; *see also id.* at 1–2, 4, 6, 8–9, 11, 16–19, 22, 26, 29, 31, 38 (invoking "public interest"). But the "public interest" mantra doesn't suffice. *All* governmental regulation of private affairs is thought to advance the public interest. Therefore, the public-rights *exception* cannot apply any time an agency claims the mantle of protecting the public. That "proposal would blow a hole in what is meant to be a narrow exception to Article III." *AT&T, Inc. v. FCC*, 135 F.4th 230, 239 (5th Cir. 2025), *cert. granted*, No. 25-567 (U.S. Jan. 9, 2026).

**3.a.** Even if the burden were on O'Meara to establish a long-standing tradition of adjudicating follow-on-like claims in both common-law and equity courts—though it is not—that burden is easily met. At common law, for example, guilds brought claims to stop unregistered parties from engaging in unlicensed practice of their respective trades.[2] The "basic conduct" targeted there is closely analogous to the conduct targeted by the SEC in this case. *Jarkesy*, 603 U.S. at 134.

And, in chancery courts, writs of injunction were issued to prevent individuals from practicing a trade or profession. *See* Op. Br. 17 (citing *Morris v. Coleman* (1812) 34 Eng. Rep. 382 (Ch) (enjoining playwright from exercising trade); *Lumley v. Wagner* (1852) 42 Eng. Rep. 687 (Ch) (similarly enjoining opera singer)). The SEC notes that these cases involved common-law breach-of-contract claims, SEC Br. 21, but the injunctive remedies there required adjudication by Chancery, not the common-law courts. As Justice Story explained, "the remedies in Courts of Equity are often very different, in their nature, mode, and degree, from

---

[2] *See Case of the Tailors of Ipswich* (1615) 77 Eng. Rep. 1218 (KB) (action in debt brought by local guild against tailor who practiced trade without approval, in violation of bylaws); *Norris v. Staps* (1616) 80 Eng. Rep. 357 (KB) (same for weavers); *Coll. of Physicians v. Rose* (1703) 87 Eng. Rep. 806 (QB) (similar involving practice of medicine).

those of Courts of Common Law, even when each has a jurisdiction over the same subject matter." 1 JOSEPH STORY, COMMENTARIES ON EQUITY JURISPRUDENCE AS ADMINISTERED IN ENGLAND AND AMERICA § 30 (4th ed. 1846). As an example, Justice Story identified the remedy of specific performance for breach of contract. *Id.*

In the follow-on proceeding here, the SEC seeks an equitable remedy, which is within the jurisdiction of Article III courts, not executive agencies.

**b.** Relatedly, the SEC's insistence that the public-rights exception controls merely by the lack of precise common-law analogs is without merit. SEC Br. 2, 11, 14, 16. As explained above, the public-rights doctrine is an *exception* to Article III jurisdiction, not the default position that must be overcome with element-for-element common-law causes of action. Courts need not engage in "abstruse historical search for the nearest 18th-century analog" because "characterizing the relief sought is more important than finding a precisely analogous common-law cause of action." *Tull v. United States*, 481 U.S. 412, 421 (1987) (citation modified); *cf. also Jarkesy*, 603 U.S. at 122 (The right to a jury trial "is not

- 11 -

limited to the 'common-law forms of action recognized' when the Seventh Amendment was ratified.") (citation omitted).

*   *   *

Ultimately, the SEC finds support only in arguments presented by the dissenting justices—and rejected by the majority—in *Jarkesy*. *Compare* SEC Br. 15, 17–18 (suggesting that public-rights claims are limited to cases between the government acting in its executive capacity and persons subject to its authority) and (*id.* 18) (asserting that private-rights claims involve the liability of one individual to another); *with Jarkesy*, 603 U.S. at 174 (Sotomayor, J., dissenting) (arguing that a "matter of public rights arises between the government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments") (quotation marks and citation omitted).

The public-rights exception does not apply. And the SEC's follow-on proceeding belongs in an Article III court.

### B. Whether Equitable or Legal, the Follow-On Claims Implicate Core Private Rights

The SEC seeks to deprive O'Meara of (1) the right to exercise a lawful trade (SEC Br. 22–23), and (2) his securities registration, a kind of

statutory property right.[3] That's sufficient to remove this case from the public-rights column.

The SEC responds that "disciplinary proceedings against securities professionals involve matters of public rights" because "no civil penalties—nor any other monetary relief—are at issue here." SEC Br. 24, 25. But equitable relief also involves private rights. As noted above, equity courts routinely issue non-monetary relief in private-rights cases. *See also Murray's Lessee*, 59 U.S. at 284.

Separately, the SEC's argument hinges on its questionable characterization of the follow-on claims as non-punitive. SEC Br. 25. Equitable remedies are generally designed to restore the status quo. *See Jarkesy*, 603 U.S. at 123; *Tull*, 481 U.S. at 422. In O'Meara's case, though, there is nothing to restore: his mistake did not harm any investors or clients.

---

[3] The SEC cannot deny "registration of a municipal securities dealer or municipal advisor if the Commission finds that the requirements of this section are satisfied." 15 U.S.C. § 78o-4(a)(2)(B). O'Meara thus has "more than a unilateral expectation" of continued registration; he has a "legitimate claim of entitlement to it," on which he relies in his "daily li[fe]." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972).

Op. Br. 8; App. 12–16. Those circumstances render the adjudication more punitive (legal) than restorative (equitable).[4]

Further, the SEC's labeling is irrelevant, since substance trumps form. *See Crowell*, 285 U.S. at 53 ("[R]egard must be had, as in other cases where constitutional limits are invoked, not to mere matters of form but to the substance…."). The dispositive question is whether the adjudication operates to deprive respondents of private rights. And here, the follow-on proceeding puts O'Meara's core private rights at stake: a fact more important than the label attached to the nature of the cause. *See Jarkesy*, 603 U.S. at 132 (recognizing a presumption in favor of Article III jurisdiction for *all* private suits—whether legal, equitable, or admiralty—because otherwise, "Article III could n[ot] serve its purpose").

The government's overemphasis of form also generates absurd results. Under its theory, an Article III tribunal, replete with a jury trial, would be required if it sought a $21 fine. But the Commission maintains

---

[4] *See Saad v. SEC*, 873 F.3d 297, 306 (D.C. Cir. 2017) (Kavanaugh, J., concurring) (casting doubt on "characterization of an expulsion or suspension as remedial rather than punitive"); *Sun Valley Orchards, LLC v. U.S. Dep't of Lab.*, 148 F.4th 121, 129 n.5 (3d Cir. 2025) (explaining how the same remedy—there, backpay—can be either legal or equitable depending on whether the underlying purpose is "to deter wrongdoers" or "provide restitution"), *cert. granted*, No. 25-966 (U.S. Apr. 27, 2026).

that it may strip O'Meara of his livelihood—limiting his activities, suspending or revoking his registration, and barring association with brokers, dealers, investment advisers, etc.—through in-house proceedings where it serves as judge, jury, and prosecutor. This remedy—a "career death penalty"—is obviously punitive. Yet per the government, no front-end judicial involvement or jury is required before the SEC shuts down his livelihood. The public-rights exception, properly comprehended, does not stretch so far.

### C. SEC Associational or Industry Bars Result in Immediate Deprivations of Liberty and Property

The government tries to soften the perceived effect of follow-on claims by characterizing them as non-coercive. SEC Br. 20. It argues that associational or industry bars are not true "injunctions" because the SEC must go to court to enforce them. *Id.* So, the theory goes, the SEC is not exercising judicial power. *Id.* at 20–21. But that argument takes a cramped view of the SEC's powers and the practical effect of their exercise—disregarding (1) the immediate, practical consequences of a bar, and (2) the narrowness of judicial review of that sanction.

**1. Effect of SEC Bar.** Under the Commission's regulations, it is "unlawful" for anyone subject to an order imposed in a follow-on

proceeding, which "suspend[s] or bar[s] him from being associated with a municipal advisor," to be "associated with a municipal advisor." 17 C.F.R. § 240.15Bc4-1 (citing 15 U.S.C. § 78o-4(c)(4), (c)(5)).

So, once a follow-on adjudication culminates in an associational or industry bar, that bar is, as a practical matter, self-executing. The respondent is not entitled to a stay if he appeals. 15 U.S.C. § 78y(c). Meanwhile, the barred advisor can neither serve nor be hired without triggering potential civil and criminal liability. In short, associational or industry bars cause an immediate alteration of legal rights, with crushing consequences for enforcement targets. The insistence that this remedy is not technically "coerc[ive]" is misleading at best. SEC Br. 20.

**2. Limited Judicial Review.** Even assuming these bars are non-coercive, the SEC's argument fails. For the fact remains that in reviewing SEC orders, courts are confined to the agency's record and must defer to its factual findings. *See* 15 U.S.C. § 78y(a)(4) (substantial-evidence standard of review). So, even if the SEC cannot enforce orders through contempt (SEC Br. 20), its factual determinations are binding on courts *that can*. Accordingly, the SEC is exercising some of the "judicial Power," U.S. Const., art. III, § 1, which includes the power to adjudge "Fact," as well

- 16 -

as law. *Id.* § 2, cl. 2; *see also Stern*, 564 U.S. at 484; *Axon*, 598 U.S. at 203 (Thomas, J., concurring) (stating "factfinding," no less than "deciding questions of law," is "at the core of judicial power").

## II. THE DISTRICT COURT HAD SUBJECT MATTER JURISDICTION OVER O'MEARA'S SEVENTH AMENDMENT CLAIM

### A. The Court Had Jurisdiction Over Both the Article III and the Seventh Amendment Claims

The SEC asserts the district court lacked subject-matter jurisdiction to consider O'Meara's Seventh Amendment claim, and that it must instead be "channeled through the Exchange Act's review scheme." SEC Br. 26. The government is mistaken. The government does not dispute jurisdiction over O'Meara's Article III claim. And since a jury can be had only in Article III courts, the district court had jurisdiction over O'Meara's Seventh Amendment claim too. *See Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 53–54 (1989) (explaining close and coextensive relationship between Article III and Seventh Amendment). After all, when a statutory claim is legal in nature—as O'Meara asserts the follow-on claims to be, given their inseparability from the original securities action—the jurisdictional Seventh Amendment and Article III questions "require[] the same answer." *Id.* at 53.

**B. The *Thunder Basin* Factors Confirm Jurisdiction**

*Axon*, applying the *Thunder Basin* factors, independently confirms that district courts maintain jurisdiction over structural challenges to Exchange Act proceedings. 598 U.S. at 181–85. O'Meara's Seventh Amendment challenge advances a structural, constitutional attack to an Exchange Act adjudication, *see Blakely v. Washington*, 542 U.S. 296, 306 (2004) (describing the jury as "a fundamental reservation of power in our constitutional structure"), unrelated to the adjudication's merits and outside SEC expertise. Under *Axon*, the claim falls squarely within 28 U.S.C. § 1331's grant of subject matter jurisdiction.

**1. Meaningful Judicial Review.** First, delay would foreclose meaningful review. The SEC's counter, that O'Meara can renew his Seventh Amendment claim on appeal (SEC Br. 28), would erase the "meaningful" component of *Thunder Basin*'s first prong. *Thunder Basin Coal. Co. v. Reich*, 510 U.S. 200, 212 (1994). As *Axon* explained, a "proceeding that has already happened cannot be undone," and "[j]udicial review of ... structural constitutional claims would come too late *to be meaningful*." *Axon*, 598 U.S. at 191 (emphasis added). The SEC thus disregards the

- 18 -

"here-and-now" nature of the injury and how that bears on the meaning-fulness of judicial review *ex post. Id.*

**2. Collaterality.** The Seventh Amendment claim is wholly collat-eral to the follow-on proceeding because it has "nothing to do with the enforcement-related matters the Commission … adjudicates." *Axon*, 598 U.S. at 193 (citation modified). The SEC says that O'Meara's claim is premature since a jury trial might be unnecessary. SEC Br. 28–29. But the SEC has already made clear that it intends to consider the propriety of a permanent ban, Op. Br. 25; App. 143, and the factors relevant to that inquiry are heavily fact-laden. *Steadman v. SEC*, 603 F.2d 1126, 1140 (5th Cir. 1979) (identifying factors for SEC consideration).[5]

The SEC also argues that O'Meara objects, not to the SEC's "power generally" or its "structure or existence," but rather, to "the lack of any procedural option for a trial by jury." SEC Br. 12, 28, 29 (citations modi-fied). This misconceives O'Meara's claim and the structural nature of the

---

[5] District practice confirms the point that the right to a jury is triggered at the beginning, based on the nature of the claim and the remedy. Fed. R. Civ. P. 38(a). Later events may obviate the need for a jury, *see* Fed. R. Civ. P. 56(a), but the right is not determined after the fact. Otherwise, every case could be brought administratively on the chance a jury wouldn't be needed.

Seventh Amendment. *See Blakely*, 542 U.S. at 306; Sheldon Whitehouse, *Restoring the Civil Jury's Role in the Structure of Our Government*, 55 Wm. & Mary L. Rev. 1241, 1278 (2014) (quoting Justice Scalia's testimony to Senate Judiciary Committee that the jury "absolutely is a structural guarantee of the Constitution").

Properly understood, O'Meara challenges the power of the Commission to entertain the follow-on adjudication "at all," *Axon*, 598 U.S. at 192, given the nature of claims and relief, and the character of the SEC as a non-Article III entity. App. 22. O'Meara does *not* object to the lack of any *procedural* option for a jury trial. SEC Br. 28. His challenge is structural; he objects to the improper *placement* of the claims in an Article II agency without jurisdiction to empanel a constitutionally imperative jury. *Cf. Cap. Traction Co. v. Hof*, 174 U.S. 1, 13–15 (1899) (holding that non-Article III entities and officers—there, a justice of the peace—cannot empanel *Seventh Amendment* juries). Under *Axon*, that kind of structural claim "has nothing to do with either the enforcement-related matters the Commission regularly adjudicates," or "those it would adjudicate in assessing the charges against" O'Meara. 598 U.S. at 193 (citation modified).

- 20 -

And "because that is so," the claim is collateral "to any Commission orders … from which review might be sought." *Id.* (citation modified).

**3. Agency Expertise.** Lastly, as *Axon* confirmed, structural constitutional claims are "outside the [SEC's] expertise." 598 U.S. at 194 (quoting *Thunder Basin*, 510 U.S. at 212). O'Meara's Seventh Amendment claim is a quintessential constitutional law claim, at the heartland of judicial competence. The SEC argues that the claim is "intertwined with or embedded in matters on which the Commission is expert." SEC Br. 29 (citation modified). But beyond asserting that the agency "regularly" does so and citing a stray (pre-*Loper Bright*) SEC opinion that evaluated a Seventh Amendment claim, the government does not explain why. *Id.* The reality is that O'Meara's Seventh Amendment claim "raises standard questions of … constitutional law, detached from considerations of agency policy." *Axon*, 598 U.S. at 194 (citation modified). The merits of O'Meara's challenge turn on the nature of (1) the follow-on causes of action, and (2) the remedies sought. *Jarkesy*, 603 U.S. at 122–23. The SEC has no technical expertise to bring to bear on either point. And the courts do not require the SEC's assistance.

### III. O'MEARA'S DUE PROCESS CLAIM IS NOT FORECLOSED BY PRECEDENT

According to the SEC, O'Meara's due process claim complains merely about a combination of prosecutorial and adjudicative functions—a theory foreclosed by *Withrow v. Larkin*, 421 U.S. 35 (1975). SEC Br. 33–35. To the contrary, O'Meara alleges two facts that distinguish this case from *Withrow* and its progeny. 421 U.S. at 58 (leaving open possibility that "special facts and circumstances" might render "the risk of unfairness … intolerably high"). O'Meara alleges, first, that the SEC's strategic fragmentation of claims between district court and the SEC's in-house tribunal and, second, the agency's obvious incentives for bias, deprive him of due process.

**1. Fragmentation of Claims.** The SEC sought and secured monetary penalties and disgorgement against O'Meara in the Southern District of California, Op. Br. 9, only to seek additional, career-ending relief in-house. When asked by the district court whether it might seek additional relief, counsel for the SEC dissembled. Op. Br. 9. But in fact, the SEC could (and should) have asked the district court for a materially identical injunction limiting O'Meara's industry activities or associations

for the protection of investors.[6] Of course, obtaining this relief in an agency proceeding is all but guaranteed. Op. Br. 29. And, as the SEC surely knows, judicial review of these home-court adjudications is narrow and deferential, 15 U.S.C. § 78y(a)(4), whereas a district court would in the first instance exercise independent legal and factual judgment in determining the proper relief.

The foregoing creates a plausible inference that the SEC wanted the friendliest forum possible in which to request its most severe sanction. That strategic gambit to deprive O'Meara of Article III safeguards undercuts the presumption of good faith and regularity that attached to the agencies' proceedings in *Withrow*; *Riggins v. Goodman*, 572 F.3d 1101 (10th Cir. 2009); and *Zen Magnets v. CPSC*, 968 F.3d 1156 (10th Cir. 2020). SEC Br. 33–34. Accordingly, those precedents do not control, and

---

[6] The government suggests that such a bar was not available in federal court because the agency lacked the predicate court-ordered, follow-the-law injunction. SEC Br. 38. But the Exchange Act, 15 U.S.C. § 78u(d)(5), empowers the SEC to request materially identical equitable relief from the district court, *see SEC v. Gupta*, No. 11-cv-7566(JSR), 2013 WL 3784138, at *3 (S.D.N.Y. July 17, 2013) (recognizing this "equitable authority"), and the agency recently asked for this relief in federal district court. *See SEC v. Abarbanel*, No. 21-cv-5429 (AS), 2025 WL 1903792, at *2–3 (S.D.N.Y. July 10, 2025).

they are anything but "materially identical" to O'Meara's claim here. *Id.* at 33.[7]

**2. Incentives for Bias.** In the government's telling, O'Meara's due process claim rises or falls with the relevance of statistical evidence of the SEC's "win rate." SEC Br. 34–35. And, the argument continues, because "a raw statistic cannot of itself show bias in a particular case," O'Meara's due process claim must necessarily fail. *Id.* at 35 (citation modified). But again, this misunderstands the claim. While *further evidence* of institutional bias in the adjudication of follow-on certainly matters, Urska Velikonja's statistical analysis is not the *sine qua non* of O'Meara's claim. Op. Br. 29 ("The SEC's win rate … is not the only consideration demonstrating the due process deficits here."). Rather, O'Meara's argument is that the fragmentation of claims with significant factual and legal overlap, between Article III court and an agency tribunal, "all but

---

[7] The government also (SEC Br. 34) cites *Blinder, Robinson & Co. v. SEC*, 837 F.2d 1099 (D.C. Cir. 1988), where the court rejected a similar due process claim to O'Meara's. *See id.* at 1104–08. But this non-binding decision has been undermined by subsequent, more demanding interpretations of the impartiality due process requires. *See Williams v. Pennsylvania*, 579 U.S. 1, 4, 16 (2016) (due process violated where just *one* of six justices had prior involvement in case, notwithstanding unanimity of panel).

guarantee[s] that … additional penalties will be imposed" in the latter. Op. Br. 30.

As the chart below shows, the overlap between the follow-on adjudication and the claims litigated in the Southern District of California is so substantial as to create a high risk of prejudgment. To secure a permanent "follow the law" injunction from that court, the SEC had to establish a "reasonable likelihood of future violations," based on "the totality of the circumstances surrounding [O'Meara and Choice Advisors] and [their] violations." *SEC v. Choice Advisors, LLC*, No. 21-cv-1669-JO-MSB, 2024 WL 4469095, at *2 (S.D. Cal. Oct. 7, 2024) (citation modified).

| Factors considered in district court | Factors considered in SEC follow-on proceeding |
| --- | --- |
| "the degree of scienter involved" | the degree of scienter involved |
| "the isolated or recurrent nature of the infraction" | the isolated or recurrent nature of the infraction<br><br>the egregiousness of the conduct |
| "the defendant's recognition of the wrongful nature of his conduct" | the sincerity of the respondent's recognition of wrongdoing |
| "the likelihood, because of defendant's professional occupation, that future violations might occur" | the likelihood that the respondent's occupation will afford opportunity for future violations |

| | |
|---|---|
| "the sincerity of his assurances against future violations" | the sincerity of the respondent's assurances against future violations |
| *See Choice Advisors*, 2024 WL 4469095, at *2. | *See In re Stewart*, Exchange Act Release No. 99613, Investment Advisors Act Release No. 6563, at 5 (S.E.C. Feb. 27, 2024).[8] |

In the follow-on proceeding here, the SEC acknowledged the "substantially identical" nature of these tests and recycled the district court's future-violations analysis verbatim in its motion for summary disposition.[9] That overlap renders the outcome of the follow-on adjudication a foregone conclusion—a proposition evidenced by Professor Velikonja's empirical findings. Op. Br. 28 ("[T]he SEC 'wins all follow-on cases, so long as it is able to locate and serve the defendant.'") (quoting Urska Velikonja, *Reporting Agency Performance: Behind the SEC's Enforcement Statistics*, 101 Cornell L. Rev. 901, 963 (2016)).

In sum, O'Meara alleges more than "mere familiarity with the facts of a case gained by an agency in the performance of its statutory role." SEC Br. 34 (citation modified). He alleges a "risk of unfairness" that is

---

[8] https://tinyurl.com/4akdxnmx.

[9] *In re Choice Advisors LLC*, Div. of Enf't's Mot. for Summ. Disposition, Admin. Proc. File No. 3-22250, at 12 (S.E.C. Jan. 17, 2025), https://tinyurl.com/2266p7vw.

"intolerably high" with respect to the "factual issue[] being adjudicated"—*i.e.*, the "public interest" of an associational or industry ban. *Riggins*, 572 F.3d at 1112. The government thus errs in suggesting that O'Meara "offers no reason to believe that follow-on proceedings present a greater risk of unfairness than other types of administrative proceedings." SEC Br. 35 (citation modified). The reason is straightforward: Having already argued, in a prosecutorial capacity, that the governing legal standard disfavors O'Meara in a closely related context—and secured on that basis an adverse judgment—the SEC reasonably appears to have "prejudged" the propriety of a public ban. *Zen Magnets*, 968 F.3d at 1168. "[D]ue process … is bent too far when such persons are then called to sit as fact finders and to make a decision affecting the property interests and liberty interests of one's reputation and standing in his profession." *Staton v. Mayes*, 552 F.2d 908, 915 (10th Cir. 1977).[10]

---

[10] The government also errs in suggesting that O'Meara's due process theory imperils "the entire adjudicative structure for Social Security benefits." SEC Br. 32. Not so. Social Security *benefits* are public rights, and their adjudication—unlike the SEC's follow-on proceeding—does not threaten the deprivation of liberty or property. And Social Security adjudications are "inquisitorial rather than adversarial." *Carr v. Saul*, 593 U.S. 83, 90 (2021) (citation modified).

## IV.    THE DISTRICT COURT HAD SUBJECT MATTER JURISDICTION OVER O'MEARA'S *RES JUDICATA* CLAIM

The district court also has jurisdiction to consider O'Meara's *res judicata* claim. Contrary to the government's claims (SEC Br. 39–40), *Axon* and *Thunder Basin* support subject matter jurisdiction.[11]

**1. Meaningful Judicial Review.** First, the government again ignores the "meaningful" element of *Thunder Basin*'s "*meaningful* judicial review" prong. It repeats that O'Meara can simply reassert the *res judicata* claim on appeal, where supposedly "meaningful" review awaits. SEC Br. 39. But that misses the whole point of claim preclusion, which is to protect parties like O'Meara from being forced into "successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit." *New Hampshire v. Maine*, 532 U.S. 742, 748 (2001). By the time the SEC litigates the follow-on claims and imposes a remedy, the purpose of *res judicata* will have been defeated. The court of appeals cannot "undo" an adjudication that "has already

---

[11] The SEC jumps ahead of the jurisdictional question and raises a merits argument, noting that courts may decline to apply *res judicata* if it would be inconsistent with Congressional intent. SEC Br. 36. Because this is a merits argument, the Court need not resolve it now. And when it is time to address the merits, the SEC will be able to show only that an act of Congress may create "an implication" that *res judicata* should not apply. *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 110 (1991).

happened" and that under *res judicata* principles had no basis for proceeding. *Axon*, 598 U.S. at 191 (citation modified). "Judicial review," in other words, "would come too late to be meaningful." *Id.*

Moreover, the government is wrong to depict *res judicata* exclusively as an affirmative defense. SEC Br. 40. While it certainly doubles as an affirmative defense, *see* Fed. R. Civ. P. 8(c)(1), *res judicata* is also a structural doctrine that advances the judicial prerogative of entering final judgments. *See S. Pac. R. Co. v. United States*, 168 U.S. 1, 49 (1897) (*Res judicata* is essential to the "conclusiveness" of judicial judgments, without which "the aid of judicial tribunals would not be invoked."); *Plaut v. Spendthrift Farm*, 514 U.S. 211, 219 (1995) (A "'judicial Power' is one to render dispositive judgments," "subject to review only by superior courts in the Article III hierarchy.") (citation modified). Accordingly, "*res judicata* is not a mere matter of practice or procedure." *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 401 (1981) (citation modified). It is a rule fundamental to the constitutionally vested prerogative of the courts to enter and enforce final judgments.

**2. Collaterality.** The government echoes the district court by characterizing the *res judicata* claim as an intrinsic aspect of the follow-on

- 29 -

adjudication. SEC Br. 40. But resolution of *res judicata* claims requires courts to look to previous actions, determine if a valid final judgment exists, and—if so—decide whether (1) the parties are the same; (2) the cause of action could have been brought in the previous suit; and (3) there was a full and fair chance to litigate it. *MACTEC, Inc. v. Gorelick*, 427 F.3d 821, 831 (10th Cir. 2005). Those inquiries have nothing to do with whether O'Meara meets "disqualifying conditions," or whether the "public interest" supports a ban, SEC Br. 19—*i.e.*, "the enforcement related matters [the SEC] regularly adjudicates." *Axon*, 598 U.S. at 193 (citation modified). Resolving O'Meara's *res judicata* claim, in short, requires courts to make considerations that are entirely antecedent to, and collateral of, the in-house claims.

**3. Agency Expertise.** Lastly, the government paints the resolution of O'Meara's *res judicata* claim as uniquely suited to the SEC's expertise in the "federal securities laws." SEC Br. 40 (citation modified). But *res judicata* is a federal common law doctrine, *see Taylor v. Sturgell*, 553 U.S. 880, 891 (2008); *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 507–08 (2001), about which the SEC has no relative expertise. *Compare Axon*, 598 U.S. at 194. Application of a *judicial* doctrine—built

out by the courts to safeguard a *judicial* prerogative, *S. Pac. R. Co.*, 168 U.S. at 49—cannot reasonably be deemed a "matter on which the Commission is expert." SEC Br. 40 (citation modified).

## CONCLUSION

For the forgoing reasons, and the reasons addressed in O'Meara's opening brief, the Court should (1) reverse the district court's judgment rejecting O'Meara's Article III and due process claims; and (2) reverse the district court's dismissal of O'Meara's Seventh Amendment and *res judicata* claims.

DATED: May 11, 2026

Respectfully submitted,

*/s/ Oliver J. Dunford*

JOSHUA M. ROBBINS
CHARLES M. BRANDT
Pacific Legal Foundation
3100 Clarendon Blvd., Suite 1000
Arlington, VA 22201
(202) 888-6881
JRobbins@pacificlegal.org
CBrandt@pacificlegal.org

OLIVER J. DUNFORD
Pacific Legal Foundation
4440 PGA Blvd., Suite 307
Palm Beach Gardens, FL 33410
(916) 503-9060
ODunford@pacificlegal.org

PAUL L. VORNDRAN
Jones & Keller, P.C.
1675 Broadway, 26th Floor
Denver, CO 80202
(303) 573-1600
pvorndran@joneskeller.com

*Counsel for Appellants*
*Matthias O'Meara and Choice Advisors, LLC*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I certify that this Brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this Brief contains 6,270 words, excluding the parts of the Brief excluded by Fed. R. App. P. 32(f).

I further certify that this Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this Brief has been prepared using Century Schoolbook 14-point font, a proportionately spaced typeface.

DATED: May 11, 2026.

*/s/ Oliver J. Dunford*

OLIVER J. DUNFORD
  *Attorney for Appellants*
  *Matthias O'Meara and Choice*
  *Advisors, LLC*

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

(1) all required privacy redactions have been made per 10th Cir. R. 25.5;

(2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents; and

(3) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Crowd-Strike Falcon, and according to the program are free of viruses.

*/s/ Oliver J. Dunford*

OLIVER J. DUNFORD
   *Attorney for Appellants*
   *Matthias O'Meara and Choice*
   *Advisors, LLC*
